Froessel, J.
Sixty-eight petitioners seek judicial review of 10 questions and answers on a competitive examination, administered by the New York City Civil Service Commission, to determine examinees’ eligibility for promotion from patrolman to sergeant in the New York City Police Department. Some of the petitioners achieved a passing grade on the examination, but have joined in this proceeding because a change of the contested answers would give them higher standings on the promotion list; the remaining petitioners, having failed the examination, would by the changes contended for attain passing grades and be placed on the promotion list.
The only question before us on this appeal is whether the proceeding was commenced within the time limited by section *551 1286 of the Civil Practice Act, which provides: “ a proceeding under this article to review a determination * * * must be instituted * * * within four months after the determination to be reviewed becomes final and binding, upon the petitioner (Emphasis supplied.)
The relevant dates, all in 1957, are:
January 5: Examination held
January 14: Beginning of week during which tentative answers were published in the City Record
January 29: Deadline for filing protests to tentative answers
March 26: Publication of final answers in the City Record
June 7: Receipt of failure notices by examinees who did not attain passing grade of 70%
July 31: Official promulgation of promotion list and receipt of eligibility notices by those who passed
October 3: Commencement of this proceeding.
The lower courts found, and respondents contend, that the four-month Statute of Limitations commenced running on March 26th, the date of publication of the final answers, since that was when the determination sought to be reviewed became final and binding. Petitioners argue, among other things, that such a holding would deny them due process of law, since the instructions on the examination booklet did not sufficiently apprise them of the necessity of making a personal copy of their answers, and they were not permitted to examine their papers and note their answers until June 7th as to the petitioners who failed, and July 31st as to those who passed.
Assuming a party knows or should know he is aggrieved by the commission’s determination of the correct answers to a competitive examination, we would agree with the lower courts that “ the act of finality which sets the period of limitation running is the adoption and promulgation, by publication, of final key answers; such adoption is the official response to any protest theretofore filed to a tentative key answer.” This was the holding in Matter of Lennox v. McNamara (16 Misc 2d 9, *552 affd. 275 App. Div. 1023, motion for leave to appeal denied 276 App. Div. 757) and in Matter of Robinson v. McNamara (16 Misc 2d 10, affd. 275 App. Div. 918), and Matter of Goldberg v. Municipal Civil Service Comm. (16 Misc 2d 11), the latter two of which relied on the Lennox decision.
In none of those cases, however, did the petitioners claim that they were deprived of the opportunity to make an effective protest to the answers chosen, and this was the issue to which Special Term primarily directed its attention in the instant case. The court did not feel it could resolve that issue until after the “ submission of an agreed specimen copy of the examination book ’ ’, and it was principally on the basis of the examination instructions that it concluded that petitioners had not been “frustrated by respondents from presenting protests at the proper time ”.
But the record before us discloses the following: The examination here consisted of 100 multiple choice questions, to each of which there were four possible answers. The examinees were instructed to “ select that answer which you believe to be the acceptable one among those listed ” and to record their answers by printing the letter A, B, O or D in ink on the official answer sheet alongside the number of the question. Three and one-half hours were allowed to complete the test, and a bell system was employed to measure the running of the allotted time.
After the sounding of the first bell, the question booklets were distributed face up and the examinees were twice instructed:
‘ ‘ DO NOT OPEN THIS BOOKLET UNTIL THE SECOND BELL IS BUNG. BEAD THIS PAGE NOW.”
* * #
“Read this page only. Do not open booklet.” (Emphasis supplied.)
The only instructions on this first page relative to retaining a copy of the answers was the following: “You may, for future reference, make a record of your answers in the question booklet and take the question booklet with you. No time, however, may be taken for this purpose after the signal has been given for the end of the test.’’’ (Emphasis supplied.) At *553 the end of the procedural instructions on the first page, the examinees were again cautioned for the third time: “ do not OPEN THIS BOOKLET UNTIL THE SECOND BELL IS BUNG”.
The sounding of the second bell signified the commencement of the test, and the third bell, indicating the end of the test, was sounded three and one-half hours later. On the page following the words “ End op Written Test ”, two further sets of iiistructions appeared. The first, entitled “Answer Sheet Collection ’ ’, stated: ‘ ‘ When finished, remain seated and summon a monitor to collect your answer sheet; then leave the building quickly and quietly ”. (Emphasis supplied.) Following this was the final set of instructions entitled “ Key Answers and Protests ’ ’, consisting of five paragraphs and setting forth in detail the procedure for contesting the correct answers selected by respondents. These instructions stated that examinees had two weeks, after publication of the tentative key answers, to file written protests in a prescribed form, and that the final key answers would be published in the City Record after all protests were considered. The publication of the final key answers was said to constitute “ official public notice by the Department of Personnel to all candidates of its final determination in this connection ”. Respondents were thus attempting to prescribe a different date from which the limitation period would otherwise commence to run were answers not published.
Some of the petitioners kept no copy of their answers, while others alleged that they had made hurried copies but were not sure that they were accurate. After publication of the tentative key answers, at least two petitioners sought permission to inspect their answer sheets with a view towards filing a protest; but these, as well as subsequent requests, were refused, as it was respondents’ policy not to permit examinees to see their examination papers until they were notified of their grades and were in possession of either failure or eligibility notices. Thus, those who failed the examination were first permitted to see their answer sheets on June 7th, while those who passed were first permitted access on July 31st, more than four months after publication of the final key ansiuers.
Unless an examinee made a personal copy of all his answers, he was not in a position either to file an administrative protest *554 to the published tentative answers or to institute a judicial proceeding to challenge the determination as to the final answers, until he was permitted to see his answer sheet. The filing of an administrative protest to the tentative answers could not properly be regarded as a mandatory prerequisite to the bringing of a judicial proceeding to review the final answers, unless petitioners knew or should have known they were aggrieved by respondents’ choice of answers. Likewise, the four-month Statute of Limitations cannot fairly be said to have commenced running against petitioners on the date the final answers were published, unless they knew or should have known they were aggrieved by that determination. It is axiomatic that “ Administrative procedure will be reviewed only at the instance of a person allegedly aggrieved thereby ’ ’ (Lederman v. Board of Educ., 276 App. Div. 527, 531, affd. 301 N. Y. 476, 493). As the court pointed out in Matter of Abramson v. Commissioner of Educ. (1 A D 2d 366, 371), petitioners “ had no reason to institute a judicial proceeding to challenge [respondents’] decision until they knew that they were aggrieved by it ”.
Petitioners had a legal right to challenge the choice of correct answers as arbitrary and capricious (Matter of Gruner v. McNamara, 298 N. Y. 395), and the question then is whether they are chargeable with notice that they would have to retain a copy of their answers, in order to be in a position to assert that right. In view of the fact that the examinees would not be permitted access to their answer sheets until several months after they took the examination, it was particularly incumbent upon respondents to spell out the necessity of making and retaining a copy of the answers, in order to be able to challenge the tentative answers administratively and the final answers judicially. Yet, all the examinees were told on the first page of instructions was: “you may, for future reference, make a record of your answers in the question booklet and take the question booklet with you.”
While we agree with Special Term that these instructions, “ when read in the context with the directions as to protest procedure ”, were “ reasonably calculated to tell all that was necessary ”, the latter directions appeared at the end of the booklet, and it was only after all the questions had been answered that the examinee would come upon them. Since petitioners *555 were not permitted to open their booklets until after the second bell sounded, the grant of permission to make copies of their answers could hardly be ‘ ‘ read in context ’ ’ with the directions as to protest procedure. The fact that it would not consume a great deal pf additional time to record 100 answers on the question booklet would be relevant only if petitioners were apprised of the necessity of so doing. Many petitioners may well have allowed themselves such time for each question as would consume the entire period alloted for the test. By the time they came upon and digested the five paragraphs of protest directions, it would be too late to copy their answers, as no time could be taken for this purpose after the third bell ending the test was sounded.
Moreover, the directions for protesting key answers were preceded by the instructions: “When finished, remain seated and summon a monitor to collect your answer sheet; then leave the building quickly and quietly.” These words would seem to mark the end of the examination, and might well have conveyed the impression that the subsequent paragraphs could be read after the examinee had turned in his answer sheet and left the building. In the excitement of the closing minutes of an examination, the examinee is more concerned with reviewing troublesome questions and making sure he has answered all the questions than with reading matter which from every indication could be read later on.at his leisure.
Respondents argue that on the first page of the question booklet petitioners were instructed to ‘ ‘ Examine your booklet after the second hell is rung to make sure that it contains all the pages and is not defective in any way. You are responsible for obtaining a complete booklet” (emphasis supplied), and that the “ obvious intention ” of these instructions “was that each examinee read all of the instructions before beginning the test.” Surely the “ obvious intention ” of this direction was merely to caution the examinees to. make sure their booklet contained all 100 questions, and not that they should use part of the allotted time to read five paragraphs of protest instructions, which appeared after the end of the written test.
One of the grounds of the holding below was that the reaction of examinees to “ the conditions surrounding an examination may be deemed part of the examination itself ’ ’ and inasmuch *556 as “ All candidates received the same instructions, * * * it may well be said that the weighing of the importance of an opportunity to retain answers in these circumstances is properly part of a test to which candidates for police sergeant may be put.” We are- unable to see how an examinee’s ability to interpret instructions for protesting answers could possibly have entered into the computation of his grade. Petitioners were examined on the substantive content of 100 questions and not on their ability to interpret instructions. There is no evidence that, as between two examinees who received the same grade, the one who retained a copy o.f his answers would be accorded a higher priority on the. promotion list than the one who did not.
In conclusion, then, since petitioners could not reasonably have been expected to read the directions for protesting answers until it was too late, the Statute of Limitations cannot fairly be said to have commenced running until they were permitted to ascertain their answers to the questions — June 7th for those who failed and July 31st for those who passed. Since this proceeding was commenced on October 3d, less than four months after either date, it was timely brought and petitioners are entitled to their day in court on the merits. We do not deem the other arguments made in the briefs of sufficient merit to warrant discussion.
The order appealed from should be reversed, with costs in all. courts, and the matter remitted to Special Term for further proceedings not inconsistent with this opinion.