**106 MILE TRANSPORT ASSOCIATES, a New Jersey Partnership Comprised of Ocean Disposal Co., Inc., General Marine Transport Corp. and A & S Transportation Company, All New Jersey Corporations, Plaintiffs,**

and

**Gulf Coast Fabrication, Inc., American Waterways Shipyard Conference of the American Waterways Operators, Inc., and Gretna Machine & Iron Works, a Division of Trinity Industries, Inc., McDermott Shipyard, a Division of McDermott, Inc., Plaintiffs-Intervenors,**

v.

**Edward I. KOCH, as the Mayor of the City of New York, Harrison J. Goldin, as Comptroller of the City of New York, Harvey Schultz, as Commissioner of the Department of Environmental Protection of the City of New York, and the City of New York, Defendants.**

No. 86 Civ. 7190 (JMW).

United States District Court,
S.D. New York.

March 27, 1987.

Lawrence M. Honig, Jared Stammel, New York City, for plaintiffs.

Terri Feinstein Sassonow, Office of the Corp. Counsel of the City of New York, New York City, for defendants.

MEMORANDUM AND ORDER

WALKER, District Judge:

## INTRODUCTION

Plaintiff 106 Mile Transport Associates ("106 Mile") together with plaintiff-intervenors Gulf Coast Fabrication, Inc. ("Gulf Coast"), American Waterways Shipyard Conference of the American Waterways Operators, Inc. ("American Waterways"), Gretna Machine & Iron Works, a Division of Trinity Industries, Inc. ("Gretna"), and McDermott Shipyard, a Division of McDermott, Inc. ("McDermott") bring this action against Edward I. Koch, as Mayor of the City of New York, Harrison Goldin, as Comptroller of the City of New York, Harvey Schultz, as Commissioner of the Department of Environmental Protection of the City of New York, and the City of New York ("City") to halt progress on a contract to build barges. This contract requires Far East Levingston Shipbuilding, Ltd. ("Far East"), a Singapore shipyard, to construct four barges for the City's use in towing sewage sludge to a dumping site 106 miles off the coast.

The plaintiffs' twice-amended complaint asserts two claims against the defendants: first, that the proposed use by the City of foreign barges to tow sludge will violate

the Jones Act, 46 U.S.C. § 883 and second, that the contract violates various provisions of state and local law, including the competitive bidding provision of N.Y.Gen. Mun.Law. § 103 (McKinney 1986).

The defendants have moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b) and have amended their motion to keep up with plaintiffs' amendments to the complaint. The Court now grants defendants' motion. The Court concludes that all parties lack standing to bring the Jones Act Claim; that, in any event, the Jones Act claim fails to state a claim upon which relief can be granted; that all parties, save Gretna and McDermott, lack standing to assert the state law claim; that the City is entitled to summary judgment against McDermott and Gretna because their state law claim is time-barred.

## FACTS

Historically, New York City has disposed of its sewage sludge, the end product of its various municipal sewage treatment facilities, by transporting and discharging it twelve miles offshore into the New York Bight Apex area of the Atlantic Ocean. In the late 1970's, it did so under an interim permit from the U.S. Environmental Protection Agency ("EPA"). However, following a 1977 amendment of the Marine Protection, Research, and Sanctuaries Act of 1972, 33 U.S.C. §§ 1401–1445, the EPA took the position that the amendment "absolutely barred all ocean dumping after December 31, 1981 of sewage sludge found harmful to the marine environment." *City of New York v. United States Environmental Protection Agency*, 543 F.Supp. 1084, 1086 (S.D.N.Y. 1981). The EPA refused to renew the City's permit which was to expire on December 31, 1981 and in 1980 the City litigated the issue. This Court ordered that the EPA evaluate evidence proferred by the City to make a reasoned determination as to whether a renewal of the permit would result in an unreasonable degradation of the environment. After so

evaluating, the EPA concluded that continued dumping at the 12 mile site would constitute an "unreasonable degradation" of the environment. The EPA then designated a site 106 miles offshore ("106 mile site") as a "Deep Water Municipal Sludge Disposal Site".

In the fall of 1984, the City's Department of Environmental Protection ("DEP") sought private contractors to remove and dump sludge at the new 106 mile site. On October 4, 1984, the DEP issued a request for proposals ("RFP") and on December 28, 1984 a proposal was submitted by 106 Mile Joint Venture, a partnership consisting of Berman Enterprises, Inc. ("Berman") and Harbor Transportation Co., Inc. ("Harbor"). A separate proposal was submitted by A & S Transportation Co., ("A & S").

On June 10, 1985 the City rejected all proposals submitted under the 1984 RFP. In the interim, the City's Office of Management and Budget had directed that the City "purchase and retain ownership of any new marine equipment such as barges that may be required for this [sewage disposal] program."

On May 27, 1986, the City entered into a consent decree in this Court setting forth a schedule for the City's compliance with its agreement with the EPA to dispose of its sewage sludge at the 106 mile site. The consent decree specified that the City would purchase its own barges for sludge removal and would transport 100 per cent of its sludge to the 106 mile site with the barges by November 1987.

On April 28, 1986, recognizing that the City would need its own barges to comply with the forthcoming consent decree, the DEP issued a request for bids ("RFB") for the construction of four 15,000 ton ocean-going barges. The bid specifications required prospective contractors to comply with N.Y. Lab.Law § 220 (McKinney 1986), New York City Adm.Code §§ 343–9.0 and 343–11.0, and Mayoral Executive Order No. 50.[1]

---

1. N.Y.Lab.Law § 220 (McKinney 1986) requires a City contractor engaged on "public work" to pay its workers the wage rate prevailing in New York City. New York City Adm.Code. § 343–9.0 requires contractors to pay federal minimum

wages. New York City Adm.Code § 343–11.0 requires City contractors to stipulate that they have done no business with several South African government agencies over a specified time period and will not engage in business with the

On May 7, 1986, in accordance with the terms of the RFB, the bids were opened and publically read aloud. The lowest bidder at $21 million was Far East. The second lowest bidder at $23 million was Islikawajima do Brasil Estaleiros SA, the third lowest bidder was McDermott, at $28 million and the seventh lowest bidder at $37 million was Trinity Industries, Inc. ("Trinity").[2] Within a day or two after the bidding results were announced, Trinity cancelled its performance bond, required under the bid specifications.

By letter dated May 27, 1986, the DEP formally notified Far East of the contract award of the contract and in a cover letter, dated July 15, 1986, to an executed contract, informed Far East that the date for commencement of the work was July 16, 1986 and the date for its completion, February 10, 1988. In a letter dated June 18, 1986, the DEP confirmed an understanding reached between the DEP and Far East that the DEP did not consider Far East subject to several New York laws, including New York Lab.Law § 220 and Mayoral Executive Order No. 50.

In February 1986, the DEP had hired 106 Mile Transport Associates ("106 Mile"), a partnership consisting of Berman, Harbor and A & S (as distinguished from 106 mile Joint Venture) to transport 10 per cent of the City's sludge to the 106 mile site from April 1986 thru November 1987 at a price of $2.4 million. This contract apparently was an interim measure to ensure compliance with the May, 1986 consent decree.

Shortly after Far East was determined to be the low bidder, 106 Mile launched a campaign to halt the construction of city owned barges. 106 Mile's first target was City Comptroller Harrison Goldin. In a series of letters between May 16 and June 26, 1986, counsel for 106 Mile urged the Comptroller to withhold his approval of the budgetary expenditures required under the Far East contract. By letter dated May 16, 1986, counsel stated that "we understand that such bids were submitted and opened on May 7, 1986 and that the low bidder was a foreign corporation." In a June 6, 1987 letter to the Comptroller, counsel indicated that 106 Mile was aware that the DEP had contracted with Far East to construct the barges and suggested that use of the barges would violate the Jones Act. The upshot of this flurry of activity was that, on July 17, 1986, the Comptroller informed 106 Mile's counsel that, despite counsel's argument, he would not interfere with the contract.

*The Proceedings Before This Court*

On September 18, 1986, 106 Mile, by now denominated a New Jersey Partnership consisting of Ocean Disposal Co. ("Ocean"), General Marine Transport Corp. ("GMT"), and A & S, filed the complaint in this action for declaratory and injunctive relief against the City defendants under the Jones Act and at the same time moved for a preliminary injunction.[3] On October 7, 1986, the City defendants moved to dismiss the complaint under Fed. R. Civ. P. 12(b).

On October 14, 1986, the plaintiffs served an amended complaint that added allegations under the Jones Act Claim and added a new claim under various provisions of state and local law. Specifically the plaintiffs asserted that the contract violated N.Y.Lab.Law § 220 (McKinney 1986), New York City Admin.Code §§ 343–9.0 and 343–11.0, and Mayoral Executive Order No. 50 ("New York Contract Laws") because Far East does not comply with these laws.

On October 20, 1986, 106 Mile withdrew its motion for a preliminary injunction and

---

agencies for the duration of the contract. Mayoral Executive Order No. 50 requires contractors to submit employment records to the City's Labor Bureau as part of a scheme to eliminate discrimination in employment.

2. Plaintiff Gretna Machine and Iron Works is a division of Trinity Industries, Inc. and for the purposes of these motions, the Court will equate the two.

3. At the outset, this Court notes that it could not declare the City's contract with Far East violative of the Jones Act nor could it enjoin the contracts's performance since the contract itself does not violate the Act. It is the proposed *use* of the barges, not the contract to build them, that is properly the subject of a claim under the Jones Act. Accordingly the Court will treat the Jones Act claim as if the plaintiff's request for relief relates to the City's proposed use of the barges.

presented applications by several parties to intervene. The Court permitted Gulf Coast, a ship builder; American Waterways, a trade association group representing companies that build and repair shallow draft commercial vessels; and Gretna, a ship building division of Trinity Industries, to intervene as plaintiffs in the action without prejudice to a subsequent motion by the City to dismiss them. With plaintiffs' motion for preliminary relief withdrawn and the government expressing its desire to move to dismiss, the Court declined to permit early discovery.

On October 30, 1986, the defendants moved again under Fed.R.Civ.P. 12(b) to dismiss the amended complaint for failure to state a claim and for summary judgment pursuant to Fed.R.Civ.P. 56. In opposing this motion, the plaintiffs sought to cross-move for partial summary judgment under Fed.R.Civ.P. 56 on the grounds that the City had violated the New York competitive bidding law, N.Y.Gen.Mun.Law § 103 (McKinney 1986). Since this claim was not presented by either the original or the first amended complaint, the Court disallowed this motion without prejudice to subsequent renewal.

On December 1, 1986, the plaintiffs moved to again amend the complaint to add an allegation to the Second Claim that defendants had violated N.Y.Gen.Mun.Law § 103 (McKinney 1986) and renewed their cross-motion for summary judgment on that claim. On December 9, 1986, the Court allowed the second amended complaint and awarded the plaintiffs limited discovery on the contract and correspondence relating to it. On January 9, 1987, the Court permitted McDermott, another shipbuilder, to intervene as plaintiff on the Second Claim, without prejudice to a later motion by the City to dismiss.

Thus, presently before the Court are defendants' motion to dismiss on the pleadings and for summary judgment and plaintiffs' cross-motion for partial summary judgment on the Second Claim alleging violations of state law.

## DISCUSSION

The complaint against which defendants have moved is by now a patchwork of legal theories advanced by various plaintiffs who would like to see the Far East contract terminated. As will be seen, its deficiencies abound even after liberal construction in plaintiffs' favor. In this regard, the Court is treating the twice-amended complaint to be once more supplemented by the contract, the June 18, 1986 letter from DEP to Far East, and letters and telexes from Gulf Coast (dated September 29, 1986), Gretna (dated October 3, 1986), American Waterways (dated October 2, 1986), and McDermott (dated January 5, 1986) requesting leave to intervene.

### I. *The Jones Act Claim*

The plaintiffs' First Claim alleges that the City's contemplated use of sludge barges built in Singapore violates the Jones Act, 46 U.S.C. § 883. The Jones Act prohibits transportation of merchandise by foreign built or documented vessels between points within the coastwise laws of the United States. The complaint alleges that 106 Mile will be injured by the City's violation of the Jones Act: first, because plaintiff cannot build or use foreign barges and cannot fairly compete against firms which do build barges outside the United States and, second, because plaintiff cannot compete for "the disposal work of the City" unless the City is precluded from contracting with foreign barge builders. No Jones Act injury is alleged as to plaintiffs other than 106 Mile.

### A. *Standing*

■ The requirement that a plaintiff have standing to redress a wrong allegedly committed by a defendant derives from the "case or controversy" limitation in Article III of the U.S. Constitution and is a threshold jurisdictional question in any litigation. "As an aspect of justiciability, the standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction and to justify the court's remedial powers on his behalf." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975), quoting *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). Questions relating to the standing

inquiry "must be answered by reference to the Article III notion that federal courts may exercise power only 'in the last resort and as a necessity,' and only when adjudication is 'consistent with a system of separated powers and [the dispute is one] traditionally thought to be capable of resolution through the judicial process.'" *Allen v. Wright,* 468 U.S. 737, 752, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984), *reh'g denied,* 468 U.S. 1250, 105 S.Ct. 51, 82 L.Ed.2d 942 (1984), quoting *Flast v. Cohen,* 392 U.S. 83, 97, 88 S.Ct. 1942, 1951, 20 L.Ed.2d 947 (1968).

■ A plaintiff, therefore, must demonstrate that he has suffered some "distinct and palpable injury," that the injury is the result of the defendant's allegedly illegal conduct and that his or her injury is likely to be redressed by relief afforded by the court. *Id.; Matter of Appointment of Independent Counsel,* 766 F.2d 70 (2d Cir.) *cert. denied,* —— U.S. ——, 106 S.Ct. 569, 88 L.Ed.2d 554 (1985).

■ A number of judge-made "prudential limitations" place further constraints on the exercise of judicial power. Ordinarily litigants may not rest their claims on violation of the legal rights of others, nor may a litigant assert a generalized grievance more appropriately addressed by the legislative branch. *Id.; Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 474, 102 S.Ct. 752, 759, 70 L.Ed.2d 700 (1982). Finally, the plaintiff's complaint must fall within "the zone of interest arguably to be protected by the statute or constitutional guarantee in question." *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). With these principles in mind, the Court addresses the claims alleged to arise under the Jones Act.

#### (a) *106 Mile*

■ It is clear that 106 Mile has no standing to assert a claim under the Jones Act against the City defendants. 106 Mile has not alleged that the City's use of Far East to build barges, as opposed to an American contractor, results in any particularized harm to 106 Mile. The plaintiff asserts merely that because it is engaged in the shipping business it will be injured by the City's use of foreign barges to tow sludge. 106 Mile, however, does not build barges and did not bid on the contract awarded to Far East. 106 Mile's allegation of an abstract injury is not judicially cognizable. *Wright,* 468 U.S. at 755–56, 104 S.Ct. at 3326–27. "Recognition of standing in such circumstances would transform the federal courts into 'no more than a vehicle for the vindication of the value interests of concerned by standers.'" *Id.* at 756, 104 S.Ct. at 3327.

The only personalized injury that has befallen 106 Mile is that it will probably be unable to renew its contract to tow sludge for the City. This injury does not provide 106 Mile with standing. It is not caused by the award to Far East, but by the City's business decision to build its own barges. A judicial determination that the City's proposed use of foreign built barges violates the Jones Act will not avoid 106 Mile's loss unless the City then (a) decides to breach the May 27th consent decree, (b) determines not to build its own barges, and (c) hires 106 Mile permanently as the official sludge-tower for the City. Such a chain of circumstances is at best improbable and far too speculative to confer standing on plaintiff 106 Mile. *See Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343.

#### (b) *Plaintiff-Intervenors*

■ Gulf Coast and American Waterways also lack standing to bring the Jones Act claim. The bare allegation that a plaintiff is a shipbuilder or a trade association of shipbuilders is insufficient to confer standing to sue under the Jones Act without some allegation of particularized injury resulting from the alleged violation. *See, Wright,* 468 U.S. at 755, 104 S.Ct. at 3326. (Plaintiffs had no standing to claim that inadequate IRS standards for denying tax exempt status to discrimatory private schools caused them "stigmatizing injury" because none of them alleged a "stigmatic injury suffered as a direct result of having personally been denied equal treatment."); *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343; *Valley Forge,* 454

U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700; *Independent Counsel,* 766 F.2d 70. The complaint does not allege that either Gulf Coast or American Waterways ever bid on the contract. Nor does it identify facts which even suggest that had the City refrained from contracting with Far East either party's position would be better than it is now, facts that identify an injury to either party. Finally, the complaint does not allege how any relief the Court could award would benefit Gulf Coast or American Waterways.[4]

█ Gretna, as a bidder on the contract, might be in a better position to claim particularized injury from a violation of the Jones Act. Yet the Jones Act claim, however broadly read, alleges injury solely to 106 Mile as a transporter of sludge. An inference can be drawn, however, that Gretna was injured because it did not receive the contract that the City awarded to Far East.

This injury might confer standing on Gretna but for the fact that the complaint does not allege how the defendants' alleged misconduct caused Gretna's plight or how relief afforded by this Court would alleviate Gretna's grievance. *See Wright,* 468 U.S. at 757–58, 104 S.Ct. at 3327–28. As the seventh lowest bidder on the contract, it is highly unlikely that Gretna would have received the bid even had the City insisted upon awarding the contract to a domestic bidder. There is no reason alleged why one of the six next lowest bidders would not have been awarded the contract. It also is wholly speculative whether a declaratory judgment against the defendants on the Jones Act claim would benefit Gretna in any way since the complaint identifies no facts which suggest Gretna's position as an unsuccessful bidder would change with action by this Court.

Like the petitioners in *Warth v. Seldin,* these plaintiffs "rely on little more than the remote possibility that their situation would have been better had respondents acted otherwise, and might improve were the court to afford relief." *Warth,* 422 U.S. at 507, 95 S.Ct. at 2209. Accordingly, the Jones Act claim is dismissed for lack of standing.

B. *Failure to State a Claim Upon Which Relief Can Be Granted*

█ Even if the plaintiffs had standing to assert the Jones Act claim, it would have to be dismissed because it fails to state a claim upon which relief can be granted. The City will not violate the Jones Act by using barges built in Singapore to tow sludge out to the 106 mile point.[5]

In order to demonstrate that use by the City of these barges would constitute a violation of the Jones Act, the plaintiffs must clear certain statutory hurdles. They must establish, (a) that sludge is "merchandise" within the meaning of the act, or alternatively, that it is hazardous waste to be incinerated at sea, 46 U.S.C. § 883, and (b) that the 106 Mile point is one embraced within the coastwise laws of the United States. Plaintiffs have failed to clear these hurdles.

By definition, this sludge is valueless material generated by the City's sewage treatment plants. All concerned are anxious to see the last of it. Not even a tortured reading of the word "merchandise" indicates that Congress meant by the term to include sludge. As the Court in *Great Lakes Dredge & Dock Co. v. Ludwig,* 486 F.Supp. 1305, 1310 (W.D.N.Y.1980), *aff'd,* 636 F.2d 1201 (2d Cir.1980) stated: "Indeed it would be difficult to label as 'merchandise' valueless polluted spoil material, which is being transported only for the

---

**4.** Compare *American Maritime Association v. Blumenthal,* 458 F.Supp. 849 (D.D.C.1977), aff'd 590 F.2d 1156 (D.C.Cir.), *cert. denied,* 441 U.S. 943, 90 S.Ct. 2161, 60 L.Ed.2d 1045 (1979) allowing the American Maritime Association, Shipbuilders Council and Seafarers International Union of North America, AFL–CIO, to bring suit against the Secretary of Treasury to challenge Custom's enforcement of the Jones Act. First, that case arose under the Administrative Procedure Act (APA), 5 U.S.C. § 702 and the plaintiffs

in *American Maritime* introduced facts demonstrating their potential injury. This case does not involve the APA and plaintiffs have made no showing in the complaint of potential injury.

**5.** In reaching this conclusion, the Court passes two substantial questions: (1) whether this claim is premature since the conduct alleged by plaintiff to violate the Jones Act has yet to occur and (2) whether the Jones Act even affords a private cause of action.

purposes of disposal." Further, Congress amended the Jones Act in 1982 to include within its ambit, hazardous waste to be incinerated at sea. The fact that Congress thought it necessary to amend the statute to specifically include "hazardous waste" indicates that Congress did not consider waste to be within the meaning of the term "merchandise."

Nor can the sludge be labeled "hazardous waste to be incinerated at sea." Although the plaintiff makes a tortured argument that sludge is hazardous waste, plaintiff does not and cannot allege that the waste is to be incinerated at sea. The undisputed fact is that the City plans not to incinerate this material but to dump it into the ocean.

Finally, a specified area designated for the discharge of sludge is not a "point" within the coastwise laws of the United States. The plaintiff argues that the Outer Continental Shelf Lands Act, 43 U.S.C. § 1333, the Marine Protection Act, 33 U.S.C. § 1412 and Presidential Proclamation No. 5030, 3 C.F.R. 22 (1983) operate to extend the definition of coastwise laws to specific points within the continental shelf. Although an intriguing argument, this is not the law. These provisions extend United States jurisdiction for limited purposes dealing with conservation and exploitation of natural resources.[6]

The Continental Shelf Act extends United States jurisdiction to

the subsoil and seabed of the outer Continental Shelf and to all artificial islands and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources....

43 U.S.C. § 1333. The Act was intended to extend federal jurisdiction over activities conducted for the purposes of exploring, developing and producing resources contained within the seabed. *See Guess v. Read,* 290 F.2d 622, 625 (5th Cir.), *cert. denied,* 368 U.S. 957, 82 S.Ct. 394, 7 L.Ed.2d 388 (1962) ("Continental Shelf Act was enacted for the purpose, primarily, of asserting ownership of and jurisdiction over the minerals in and under the Continental Shelf.") There is no indication that Congress intended by this statute to extend Federal laws like the Jones Act to sludge dumping sites which are wholly unrelated to the development of natural resources in the seabed of the Continental Shelf.[7] *See Treasure Salvors, Inc. v. Unidentified Wrecked, Etc.,* 569 F.2d 330, 339–40 (5th Cir.1978).

Accordingly, this Court concludes that an ocean dumping site for sludge is not a "point" within the coastwise laws of the United States. The Court reaches this decision regardless of whether sludge is dispersed in the ocean or sinks to the bottom.

The plaintiff and plaintiff-intervenors have not stated a cause of action under the Jones Act.

---

6. The plaintiffs' arguments based on the Marine Protection Act and the Presidential Proclamation are plainly frivolous. The Marine Protection Act authorizes the Administrator of the EPA to issue permits for dumping in the ocean. 33 U.S.C. 1412 *et seq.* It does not extend federal law to every point on the ocean or its floor. Presidential Proclamation No. 5030, 3 C.F.R. 22 (1983), establishes an "exclusive economic zone" beyond the nation's territory for purposes of exploring, exploiting, conserving and managing natural resources. It authorizes an extension of jurisdiction only with regard to establishment and use of artifical islands and structures having economic purposes and with regard to protection and preservation of the marine environment. The Jones Act is unrelated to these purposes.

7. Customs Service Rulings are consistent with this interpretation. Customs has held that the Jones Act applies to "jetfoil vessels" used to transport workers to a drilling platform located on the Continental Shelf, more than 200 miles off the coast of Alaska. C.S.D. 83–52. Customs, however, has issued several opinions that transportation to a dumping point off the coast is not within the coastwise laws of the United States. In May 1986, Customs forwarded one such letter ruling to John Bajor, an agent for Far East. *See also* C.S.D. 83–94 ruling that artificial island built with gravel becomes subject to Jones Act only when a part of it rises above mean high water.

## II. *The State Claims*

The Second Claim is not a model of clarity. When the plaintiffs first brought it on October 14, 1986, its thrust was that Far East does not comply with New York State and City laws that require a contractor with the City to pay prevailing New York City and federal minimum wages, refrain from discriminating, and boycott South Africa ("New York Contract Laws"). The plaintiffs claim injury from these violations in that the offer of 106 Mile to tow the City's sludge was unfairly compared to the bid of a foreign ship builder who does not comply with state and local laws.

The amendment of December 9, 1986 added one final allegation to the state law claim asserting that the City violated N.Y. Gen.Mun.Law § 103 (McKinney 1986) by altering the terms of the contract after the bid had been awarded to Far East. The plaintiff and plaintiff-intervenors claim that they were injured because Gretna and other bidders were not provided an opportunity to submit a bid on the contract signed by Far East. They contend that the violation of this law requires that the contract be set aside.

### A. *Standing—The New York Contract Laws*

#### (a) *106 Mile*

■ 106 Mile does not have standing to bring a claim under the New York Contract Laws. 106 Mile suffered no injury from the alleged failure to comply with the New York Contract Laws or § 103. The complaint alleges only that 106 Mile's offer to tow sludge was unfairly compared with Far East's offer to build barges. This contention is senseless. It is undisputed that the City rejected all offers from private contractors, including 106 Mile, to tow sludge in June 1985 because the City had decided to build and operate its own barges.[8] The City did not publish the RFB for the sludge barges until April 1986. Thus, the 106 Mile bid in 1984 was never compared at all to Far East's bid of April 1986, much less unfairly.

As noted earlier, 106 Mile's real quarrel with the City is that the City has decided to own and operate its own barges, thus depriving 106 Mile of the City's sludge towing business. This injury is wholly unrelated to Far East's non-compliance with New York Contract Laws. Further, 106 Mile fails to allege how any relief the Court might afford it would alter the City's decision to construct its own barges and allow 106 Mile to continue to tow the City's sludge.

Nor is 106 Mile within the zone of protection created by any of these statutes. The New York Contract Laws were intended variously to increase wages of New York State employees, to ensure that parties contracting with the City do not discriminate in employment, and to sanction South Africa for its discriminatory policies, not to provide relief for frustrated sludge-towers. Thus, 106 Mile lacks standing to bring the claim under the New York Contract Laws. *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1974); *Association of Data Processing Services*, 397 U.S. at 153, 90 S.Ct. at 829.

#### (b) *Gulf Coast and American Waterways*

■ Nor does the complaint allege that Gulf Coast and American Waterways were harmed in such a way as to provide them with standing to compel the City to enforce the New York Contract Laws. Indeed, neither plaintiff is mentioned anywhere in the Second Claim, or for that matter in the entire complaint, save the caption. No fact presented to the Court raises the remotest inference that they have been injured by Far East's alleged failure to comply with New York Contract laws. *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343. Moreover, like 106 Mile, they are not within the "zone arguably to be protected" by these state and municipal statutes. *Association of Data Processing Services*, 397 U.S. at 153, 90 S.Ct. at 829.

#### (c) *Gretna and McDermott*

■ Gretna and McDermott also lack standing to enforce the New York Contract

---

**8.** Moreover, the 106 Mile partnership whose offer was rejected in 1984 was comprised of wholly different entities than the 106 Mile plaintiff herein.

Laws. By a liberal extension of 106 Mile's allegation of injury, it might be inferred that McDermott and Gretna, the plaintiff-intervenors that bid on the contract, complain that their bids were unfairly compared with that of Far East which did not comply with the laws. Thus, it can be said the Gretna and McDermott complain of a specific injury. However, the complaint is devoid of any allegation that this injury could be redressed by relief from this Court. The complaint does not allege, for instance, that McDermott or Gretna would have received the contract if Far East had not been a bidder or that these two firms would have benefited in any way had the City forced Far East to comply with the New York Contract Laws.

■■■ Even had these allegations been made, the claim still fails because, like all the other plaintiffs, McDermott and Gretna are not within the zones of protection afforded by these provisions. *See, Association of Data Processing Services,* 397 U.S. at 153, 90 S.Ct. at 829. The New York Contract Laws were enacted to deal with specific problems related to wage rates,

employment discrimination and South African sanctions, not to ensure parity in bidding.[9] *Id.*

### B. *Standing—Section 103*

#### (a) *106 Mile, Gulf Coast and American Waterways*

■■■ As for the alleged violation of N.Y. Gen.Mun.Law § 103 (McKinney 1986), 106 Mile, Gulf Coast and American Waterways do not have standing on this issue because they did not bid on the contract and, therefore, the alleged violation of the competitive bidding laws did not injure them.[10]

#### (b) *Gretna and McDermott*

McDermott and Gretna do have standing under the competitive bidding law, N.Y. Gen.Mun.Law § 103 to complain that they were treated unfairly in the bidding process. *Allen v. Eberling,* 24 A.D.2d 594, 262 N.Y.S.2d 121, 122 (2d Dept.1965) ("While it is true that an unsuccessful bidder has standing to maintain a proceeding to review the award of a contract in violation of a statute requiring that the contract

**9.** In passing, the Court notes that, in any case, the plaintiffs have not stated a claim upon which relief can be granted under the New York Contract Laws.

A. *Labor Law § 220*

Plaintiffs have failed to state a cause of action under N.Y.Lab.Law § 220 because the provision does not apply to contracts between New York municipalities and out of state companies. *Ewen v. Thompson-Starret Co.,* 208 N.Y. 245, 250, 101 N.E. 894 (Ct. of App.1913) *Garofano Construction Co., Inc., v. City of New York,* 180 Misc. 539, 540, 43 N.Y.S.2d 26 (App.Term.1943), *aff'd* 266 A.D. 960, 44 N.Y.S.2d 682 (1st Dept. 1943). Thus, because Far East is an out-of-state contractor it has no obligation to comply with this law.

B. *New York City Administrative Code § 343–9.0*

The New York City Administrative Code § 343–9.0 by its own terms has no applicability outside the United States and hence Far East, if it does not pay the federal minimum wage to its employees, cannot be charged with violating this statute. *Kaye Thermometer Corp. v. Commisioner of Purchases,* 43 Misc.2d 1026, 252 N.Y.S.2d 639 (Sup.Ct.1964).

C. *New York City Administrative Code § 343–11.0*

New York City Administrative Code § 343–11.0 prohibits all city agencies from contracting for the supply of goods or services absent a

stipulation from the contractor that the contractor has not sold goods or services to specified agencies of the South African government 12 months before the contract and that the contractor will not do so during the duration of the contract. The City has not violated this provision in its contract with Far East, because the stipulation in question appears in the contract.

D. *Mayoral Executive Order No. 50*

Mayoral Executive Order No. 50 requires contractors to include within the contract a clause stipulating that they will comply with the order and also that they will supply the City with employment records. The June 18, 1986 letter, however, asserts that the City would not require Far East to do so. Accordingly this failure to comply cannot be considered a violation of the Order.

**10.** If these plaintiffs were New York taxpayers, they could conceivably bring a taxpayers suit to remedy a violation of the competitive bidding laws. *See Reilly v. Town of Brookhaven,* 34 A.D.2d 1001, 313 N.Y.S.2d 72, 73 (2d Dept.1970). The complaint does not allege that these parties pay New York taxes and, consequently, they have no standing to assert a taxpayers suit under § 103. *See, Barnes v. Binghampton Urban Renewal,* 127 Misc.2d 859, 487 N.Y.S.2d 519, 521 (Sup.Ct.1985) ("There is no allegation that either of them is a taxpayer, the *sine qua non* for either a statutory or common law citizen taxpayer action.")

go to the lowest responsible bidder, this procedure is sanctioned merely to ensure enforcement of the statute.")

## C. *Statute of Limitations*

Although McDermott and Gretna have standing to assert a violation of N.Y.Gen. Mun.Law § 103, their claims are barred by the four month statute of limitations of New York Civ.Prac. L. & R. 217 (McKinney 1986).

Section 217 provides in pertinent part that,

 ...a proceeding against a body or officer must be commenced within four months after the determination to be reviewed becomes final and binding upon the petitioner.

N.Y.Civ.Prac. L. & R. 217.

While all parties agree as to the applicability of this four month limitation period, they argue a plethora of starting dates for this period as well as dates upon which the Trinity and McDermott actions should be determined to have commenced.

 The limitations period of § 217 begins to run when there has been a final and binding determination by which the plaintiff is aggrieved. *Martin v. Ronan*, 44 N.Y.2d 374, 382, 405 N.Y.S.2d 671, 675, 376 N.E.2d 1316, 1320 (1978), *reh'g denied*, 45 N.Y.2d 776, 408 N.Y.S.2d 1027, 380 N.E.2d 350 (1978). A decision is considered to be final and binding when "it has an impact upon a petitioner." *Filut v. New York State Educ. Dept.*, 91 A.D.2d 722, 457 N.Y.S.2d 643 (3d Dept.1982), *appeal denied*, 58 N.Y.2d 609, 462 N.Y.S.2d 1026, 449 N.E.2d 426 (1983). The plaintiff must know he is aggrieved by the determination. *Martin*, 405 N.Y.S.2d at 675, 376 N.E.2d at 1320; *O'Neill v. Schechter*, 5 N.Y.2d 548, 186 N.Y.S.2d 577, 159 N.E.2d 146 (1959) (Petitioner was allowed four months in which to challenge New York City Civil Service Commission's selection of test answers from time he received copy of his answers because without a copy of his answers he could not know he was aggreived by the Commission's selection of correct answers which were published on an earlier date); *See also Edelman v. Axelrod*, 111 A.D.2d 468, 488 N.Y.S.2d 521 (3d Dept. 1985).

 The adverse determination of which McDermott and Gretna complain is the City's refusal to award the barge contract to them. The bids were opened and publically read aloud on May 7, 1986 and Far East was awarded the contract on May 27, 1986. Thus, on May 27, 1986, when the City formally awarded the contract to Far East, this determination became "final and binding" as to them. *See, Martin v. Ronan*, 405 N.Y.S.2d at 675, 367 N.E.2d at 1320; *Barnes v. Binghampton Urban Renewal Agency*, 115 A.D.2d 803, 495 N.Y. S.2d 751, 752 (3d Dept.1985).

The plaintiffs raise a number of meritless arguments in an attempt to evade the implications of a May 27, 1986 starting date.

As their latest date for commencement of the limitations period, plaintiffs suggest December 11, 1986 when they obtained discovery of the June 18th letter. They argue that the City's "bad faith" in withholding the letter and contract from them mandates equitable tolling of the statute. Plaintiffs' conclusory allegations do not raise an issue of fact regarding the City's behavior let alone support summary judgment on this issue in their favor. Plaintiffs have identified no facts in support of their "bad faith" claim. The short answer to it is that, until this Court ordered discovery on December 9, 1986, the City was under no obligation to furnish the documents.

Gretna and McDermott next claim that the limitation period began on October 20, 1986, when plaintiff's counsel first learned of the June 18 letter from the City to Far East stating that adherence to the contract terms related to the New York Contract Laws would not be required. They argue that N.Y.Civ.Prac. L. & R. 203(f) extended the commencement of the limitations period until the date they discovered the existence of the June 18th letter.

 Section 203(f) provides an alternative limitations period for causes of action where the Statute of Limitations begins to run upon the actual or imputed discovery of facts. The section, however, applies only in cases where the underlying Statute of Limitations explicitly runs from dis-

covery of necessary facts. *Gerber v. Manufacturers Hanover Trust Co.*, 64 Misc.2d 687, 315 N.Y.S.2d 601, 603 (N.Y.Civ.1970) ("Unless the statute itself expressly provides that the cause of action does not accrue until the facts are discovered, such as in cases of fraud or breach of prospective warranty, the statutory period begins to run from the time of the wrong even though the injured party had no knowledge of its existence.") Because the applicable statute of limitations in this case, § 217, allows the plaintiff no such grace period, § 203(f) is inapplicable. Indeed, a different result would frustrate the clear intent of § 217 to protect municipalities from belated lawsuits designed to undo important actions taken by their public officials.

Moreover, in this case, discovery of the June 18th letter could have added nothing to plaintiff's knowledge. It could hardly come as a surprise to learn that New York laws relating to employment practices would not be enforced against a Singapore builder. Indeed, the plaintiffs stated in the first amended complaint filed on October 14, 1986 that it was likely the contract with Far East was different from what it would have been with a domestic bidder whose bid was $7,000,000 below the next lowest bidder. Moreover, the fact that these laws were not applicable to Far East, or any other out-of-state bidder, is a matter of New York law. Thus, given the plaintiffs' knowledge, actual or constructive, as of May 27, 1986, that Far East would not be held to compliance with the New York Contract Laws, the fact that the plaintiffs later learned that this was embodied in a letter from DEP to Far East, making explicit what all had known all along, is irrelevant to a determination of the date upon which the adverse determination became final and binding as to McDermott and Gretna.[11]

 Trinity and McDermott also argue that the limitation period began on July 17,

1986 when the City comptroller, Harrison Goldin, rejected entreaties of counsel for 106 Mile to refuse to fund the contract. While this argument, if credited, would enable Trinity and McDermott to proceed, assuming a relation back of the claim to October 14, 1986 when the first amended complaint was filed, the argument is spurious. The City comptroller was without authority to halt the contract or to withhold funding and thus his decision was meaningless, much less "final and binding" within the meaning of § 217. City Charter § 343(b). Even if the comptroller had the power to interfere with the barge contract, a series of entreaties to induce him to do so would not render an otherwise final determination nonfinal. *Filut, supra*, 457 N.Y. S.2d at 645 ("Neither an application for reconsideration nor a series of inquiries regarding reconsideration will extend or toll the four-month Statute of Limitations"). As stated earlier, the May 27 award of the contract to Far East cut off any possibility that McDermott or Gretna could receive the contract and this is the date the adverse determination became final and binding as to these two plaintiff-intervenors.

With a May 27 starting date, the four month limitation period closed on September 27, 1986. The claim under § 103 was first allowed to be asserted, subject to motions to dismiss, on December 9, 1986. Unless this claim can be said to relate back to the September 19, 1986 complaint, it is time barred.

Relation back is governed by Fed.R. Civ.P. 15(c) which states that

whenever the claim or defense asserted in the amended pleadings arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleadings, the amendment

---

11. The plaintiffs claim also that the Statute of Limitations could not begin to run before June 18 because the letter constituted the violation of § 103. This argument fails on two grounds. First, the contract was both bid and awarded at $21,000,000. Thus, the City, as well as plaintiffs, is held to have been aware that Far East was not in compliance with the New York Contract Laws. Therefore, the June 18th letter did not change the relationship between the City and Far East. Second, the adverse determination complained of is the award of the contract to Far East rather than to Gretna or McDermott, not a letter written after the award of the contract. The June 18th letter was merely evidence of how the City handled the question of the application of New York laws to a foreign builder.

relates back to the date of the original pleading.

 To decide whether relation back is appropriate, the Court must focus on the notice given by the factual situation set forth in the original pleading. *See Rosenberg v. Martin,* 478 F.2d 520 (2d Cir.), *cert. denied,* 414 U.S. 872, 94 S.Ct. 102, 38 L.Ed.2d 90 (1973); *Unicure, Inc. v. Thurman,* 97 F.R.D. 1 (W.D.N.Y.1982). If the facts in the original pleading do not provide defendant with notice of facts out of which the time-barred claim arises then relation back is inappropriate. *Id.; see also Oliner v. McBride's Industries, Inc.,* 106 F.R.D. 9 (S.D.N.Y.1985).

Although the plaintiffs' Jones Act Claim (raised in the original complaint) and § 103 Claim (raised in the second amended complaint) both relate to the contract between Far East and Singapore, the factual allegations that form the basis for the two claims are distinct. The original complaint, to which McDermott and Gretna were not parties, alleged only that the City's award of the contract to a foreign corporation was violative of the Jones Act. The complaint contained no factual allegations which could remotely suggest to the defendants that two new plaintiff-intervenors would later object to the process by which the City awarded the contract to Far East. In short, there was nothing in the original complaint to put the City on notice that the Jones Act litigation would ultimately lead to a suit by two different plaintiffs under the competitive bidding laws. Consequently, the claim brought by Gretna and McDermott under § 103 cannot relate back to the filing of the original complaint. It is, therefore, dismissed as time-barred.[12]

## CONCLUSION

This action by 106 Mile and the plaintiff-intervenors to frustrate the City's legitimate effort to obtain cost effective sludge removal in furtherance of an order of this Court may not proceed. The Court concludes that the parties lack standing to sue upon the Jones Act and the New York Contract laws and that the Statute of Limitations bars any prosecution of the § 103 claim. Accordingly, all claims are dismissed with prejudice.

SO ORDERED.

---

12. Arguably the second amended complaint could relate back to the October 14, 1986 amendment which at least alleged a violation of state law. Even so, the October 14, 1986 complaint, filed 17 days after the close of the limitations period on September 27, 1986, itself was time-barred.